The undersigned Assistant United States Attorney has reviewed the entire tracking warrant package and approves.

_(signature)_

Vito A. Iaia

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

**IN RE:** APPLICATION FOR AN ORDER AUTHORIZING THE INSTALLATION AND MONITORING OF A TRACKING DEVICE IN OR ON:
**2007 BLUE TOYOTA AVALON** WITH **VIRGINIA LICENSE PLATE NUMBER TLW 6182** AND **VEHICLE IDENTIFICATION NUMBER 4T1BK36B67U243291**

**SEALED**

Criminal No.  3:25mj49

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR TRACKING DEVICE

I, Alen Krso, being duly sworn, hereby depose and state:

### Affiant Training and Experience

1.    I have been a sworn law enforcement officer since 2010, when I began as an Officer in the Uniformed Division of the United States Secret Service, and received training from both the Federal Law Enforcement Training Center's Uniformed Police Training Program in Brunswick, Georgia as well as the United States Secret Service's Uniformed Division Training Academy in Laurel, Maryland. The training covered various aspects of federal law enforcement, including the investigation of narcotics-related offenses.

2.    Upon becoming a Special Agent in 2019, I received training from the United States Secret Service's Special Agent Training Academy in Laurel, Maryland. As part of my duties as a Special Agent, I investigated violations related to mail, wire and bank fraud, as well as identity theft and cybercrime. I received additional training in network intrusion response, money laundering, and crimes involving cryptocurrency offered through the Federal Law Enforcement Training Center, the United States Secret Service, and the National Computer Forensic Institute. I received advanced training for cryptocurrency- related investigations and attended cryptocurrency and cybercrime educational conferences. I also participated in investigations involving both domestic and international subjects that utilize electronic devices and the financial sector's infrastructure in the furtherance of criminal activity. In April of 2025, I joined the Drug Enforcement Administration as a Special Agent and graduated from the Drug Enforcement Administration's Special Agent Transition Program, where I

received training specifically in conducting narcotics investigations, including identifying illicit narcotics activities, performing surveillance, tactical and undercover operations, and utilizing confidential sources.  I am currently assigned to the Drug Enforcement Administration Task Force Group 21, which is located in Richmond, Virginia ("Richmond DEA").

3.      I submit this affidavit in support of an application for a tracking warrant to authorize the placement and monitoring of a tracking device on a blue 2007 Toyota Avalon bearing Virginia License Plate Number TLW 6182, and with Vehicle Identification Number 4T1BK36B67U243291 ("SUBJECT VEHICLE"),[1]which I submit that the facts alleged herein provide probable cause to believe is currently being used in furtherance of illegal narcotics trafficking and conspiracy to illegally distribute narcotics, all in violation of 21 U.S.C. §§ 841(a)(1) and 846.  I further submit that installation of a tracking device in or on the SUBJECT VEHICLE, and the monitoring of that tracking device, will yield evidence, fruits, and/or instrumentalities of illegal narcotics trafficking and the identification of individuals who are engaged in the commission of these alleged crimes.

## Sources of Information

4.      The facts and information contained in this affidavit are based on my training and experience, personal knowledge, and observations during this investigation, as well as information provided by other agents involved in this investigation, which I believe to be reliable.  All observations that were not made personally by me were related to me by the persons who made the observations.

5.      This affidavit contains only that information necessary to establish probable cause in support of an application for the requested tracking warrant.  This affidavit is not intended to include each and every fact and matter observed by, or made known to, agents of the government.  Further, my understanding of the facts and circumstances described herein may change or evolve as the investigation progresses.

## Probable Cause

6.      On or about June 2025, members of the Richmond DEA were informed by the DEA's Detroit Division ("DEA Detroit") of an impending money-for-narcotics exchange involving approximately 15 kilograms

---

1 A check of Department of Motor Vehicle records on or about July 7, 2025 disclosed Virginia vehicle registration TLW 6182 is registered to Lamar Shelton BROWN at 790 Prospect Avenue, Charlottesville, VA, 22903.

of suspected cocaine hydrochloride. DEA Detroit stated that a Confidential Source (CS) was in contact with Jose LUVIANO, a known narcotics distributor operating out of Florida. LUVIANO requested the CS's assistance in coordinating the distribution of narcotics throughout the United States, including to Virginia. LUVIANO then put the CS in contact with an individual named "JR Knoxville" who then provided the CS with details about the customers in Virginia waiting to receive a shipment of illegal narcotics.

7. "JR Knoxville" told the CS that the customers in Virginia had gathered approximately $250,000.00 in United States Currency to purchase between 10 and 20 kilograms of cocaine. "JR Knoxville" told the CS that the telephone number (305) 413-9837 is the number belonging to a customer who was requesting multi-kilogram quantities of cocaine to be delivered to Virginia.

8. Agents identified a WhatsApp account associated with telephone number (305) 413-9837 and later identified the user of that number as Damion REEVES. REEVES' identity was determined by comparing a profile picture from the WhatsApp account connected to phone number (305) 413-9837 to REEVES' Florida driver's license photograph, as well as by reviewing other open-source databases.

9. On or about May 2025, the CS contacted REEVES at phone number (305) 413-9837 and REEVES informed the CS that REEVES was in control of approximately $225,000.00 to purchase approximately 15 kilograms of cocaine. During a recorded telephone call via WhatsApp, REEVES advised the CS that, "his boys were ready in Charlottesville, Virginia," indicating to the CS that co-conspirators in the REEVES Drug Trafficking Organization were ready to accept kilogram quantities of narcotics and, in exchange, make a payment in the form of bulk cash currency. REEVES advised the CS that REEVES would provide the phone number belonging to a female who would be bringing the bulk currency and picking up the narcotics.

10. On or about June 6, 2025, REEVES provided phone number (434) 365-4700 to the CS as the number for the female located in Virginia who would provide the bulk cash currency in exchange for approximately 15 kilograms of cocaine. Investigators then sent an administrative subpoena to AT&T and learned that the subscriber associated with phone number (434) 365-4700 is Aniya CUNNINGHAM. Additionally, phone number (434) 365-4700 was connected to a CashApp account with the username "therealniyahc." Using law enforcement database queries, investigators identified that CUNNINGHAM owns a 2024 Buick, gold in color,

and bearing Virginia license plate number TGN 5166, which is registered in her name at 15431 Holcomb Bridge Drive, Chesterfield, VA 23832.

11.     On or about June 6, 2025, investigators obtained a search warrant for Global Positioning System ("GPS") ping data for phone number (434) 365-4700 and observed, pursuant to the telephone ping, that the phone was traveling from Chesterfield, Virginia, towards Charlottesville, Virginia. During this time, the CS informed REEVES that a courier would be bringing the narcotics and delivering them to CUNNINGHAM, and would contact CUNNINGHAM from an undercover phone number. A DEA undercover agent (hereafter, UC) then contacted CUNNINGHAM via telephone call and text messaging and began coordinating the exchange of cash for 15 kilograms of narcotics. In order to facilitate the exchange of money for narcotics, DEA agents created kilogram packages that appeared to contain cocaine when in fact they did not contain any controlled substance.

12.     As the UC was coordinating the narcotics transaction with CUNNINGHAM, investigators continued to monitor CUNNINGHAM's phone pings. Investigators observed that the pings showed her travelling to the area of a Giant Food (hereafter, Giant) grocery store located at 1900 Abbey Road, Charlottesville, Virginia 22911. The ping appeared to be stationary around Giant before driving towards Richmond, Virginia.

13.     On or about the evening of June 6, 2025, the DEA UC met with CUNNINGHAM in the parking lot of the Kroger grocery store located at 9000 Staples Mill Road, Henrico, Virginia 23228. The DEA UC provided CUNNINGHAM with a bag containing 15 kilograms of imitation cocaine and, in exchange, CUNNINGHAM handed the UC a bag containing $115,900. During the transaction, the DEA UC opened the bag of imitation cocaine to ensure that CUNNINGHAM knew she was receiving 15 kilograms of cocaine.

14.     Following the transaction, CUNNINGHAM drove away from the area. A Virginia State Police ("VSP") Trooper observed CUNNINGHAM commit a traffic infraction and conducted a traffic stop on her vehicle. A police canine was utilized to conduct a free air search of CUNNINGHAM's vehicle approximately 7 minutes after the traffic stop. The police canine positively alerted to the presence of narcotics in CUNNINGHAM's vehicle. The VSP Trooper subsequently searched CUNNINGHAM's vehicle and discovered the bag containing 15 kilograms of (imitation) cocaine in the trunk of CUNNINGHAM's vehicle. The VSP Trooper also conducted a search of CUNNINGHAM's person and discovered, in CUNNINGHAM's pants,

approximately 28 grams of powdered acetaminophen that was packaged in a vacuum sealed bag consistent with how ounce quantities of cocaine are typically packaged., and, in the driver's side door of CUNNINGHAM's vehicle, $10,000 of cash was found bundled together with a rubber band.

15.    Following the recovery of the imitation cocaine from her car, CUNNINGHAM was read her *Miranda* warnings by the VSP Trooper on scene. CUNNINGHAM was then transported to a Chesterfield Police Department facility where DEA Special Agent Matthew Rubright read her *Miranda* warnings a second time prior to interviewing CUNNINGHAM about the events of the night.  After she was read her *Miranda* warnings, CUNNINGHAM informed investigators that she was willing to cooperate with them and provide information.

16.    CUNNINGHAM stated that the 15 kilograms of narcotics belonged to REEVES. CUNNINGHAM stated that REEVES told her to pick up an item from REEVES' "cousin" at the Giant grocery store in Charlottesville, Virginia. CUNNINGHAM stated that she was contacting REEVES via the mobile application, FaceTime. According to CUNNINGHAM, REEVES was using the phone number (305) 413-9837. CUNNINGHAM stated that she was willing to make recorded phone calls to REEVES and gave investigators consent to look at the contents of her cell phone. Investigators observed text message communications between CUNNINGHAM and REEVES that appeared romantic in nature. CUNNINGHAM told investigators that she and REEVES were supposed to date each other when REEVES got out of prison. Investigators also observed that CUNNINGHAM appeared to be sending REEVES money while he was in prison and had photos of REEVES' Zelle account identification. At the request of investigators, CUNNINGHAM attempted to place a recorded phone call to REEVES, but REEVES did not answer. Following the interview, CUNNINGHAM was informed that she was not going to be arrested due to her cooperation. CUNNINGHAM was requested to maintain contact with investigators if REEVES attempted to communicate with her.

17.    On or about June 9, 2025, CUNNINGHAM was interviewed at the DEA Richmond office. CUNNINGHAM was informed that she was not being arrested. CUNNINGHAM was asked again if she was still willing to cooperate and she replied that she was.[2]

---

[2] In her first interview, CUNNINGHAM made statements that investigators knew to be false. In the first interview, CUNNINGHAM was asked about the plastic bag of white substance that was in her pants at the traffic stop. CUNNINGHAM told investigators that the plastic bag of white substance was placed on the floorboard of her vehicle by the same individual who placed the 15 kilograms in her

18.     CUNNINGHAM stated that she met with an older Black male at the Giant grocery store in Charlottesville, Virginia, and that she parked in an area of the parking lot where she could see Domino's Pizza over her right shoulder. CUNNINGHAM stated that the Black male (later identified by law enforcement as BROWN) arrived, driving the SUBJECT VEHICLE, and placed a green reusable shopping bag in the passenger seat of her car, which contained $125,900. CUNNINGHAM also stated that the Black male (BROWN) placed a large bundle of cash on top of the bag and said, "you're going to have a good time tonight" and "drive safe." Investigators located this bundle of cash in the driver's side door of CUNNINGHAM's vehicle during the traffic stop and seized it. Investigators determined that the amount was $10,000, which was bundled together with a rubber band. CUNNINGHAM stated that she knew that some of the $10,000 was supposed to be for her, but she did not know if all of it was. Based on this statement, and my training and experience, the $10,000 was payment that was made to CUNNINGHAM by BROWN and REEVES in exchange for CUNNINGHAM paying $115,900 in cash for 15 kilograms of cocaine which she was to deliver back to BROWN.

19.     On or about June 12, 2025, your affiant obtained video from the security cameras for the Giant located at 1900 Abbey Road, Charlottesville, Virginia 22911, and observed CUNNINGHAM's vehicle meet with a blue 2007 Toyota Avalon, later identified as the SUBJECT VEHICLE and registered to BROWN.3 Investigators observed a Black male, who was later identified by CUNNINGHAM through a photo line-up as BROWN, exit the SUBJECT VEHICLE and appear to place something on the passenger seat of CUNNINGHAM's vehicle. BROWN then reentered the driver's seat of the SUBJECT VEHICLE. CUNNINGHAM and BROWN then drove away from the area in separate cars. The video from Giant was generally consistent with CUNNINGHAM's statement.

20.     On or about June 13, 2025, CUNNINGHAM was provided with a photo array with no written identifiers on the photos other than numbers one through six. The photos contained a photo of BROWN and five

car (known to investigators to be a DEA Undercover Agent). CUNNINGHAM also told investigators that she did not know what the $10,000 of currency was for. In the second interview, CUNNINGHAM told investigators that the bag of white substance also belonged to REEVES and someone was supposed to pick it up from her earlier in the day but that person never came. CUNNINGHAM also told investigators that she knew at least part of the $10,000 was payment meant for her.

3 While reviewing the Giant video, investigators could make out multiple numbers and letters in the license plate, but not all of them. After trying approximately 2-3 different suspected combinations, investigators received a return for TLW 6182 from Virginia DMV which indicated the vehicle bearing this license plate was a blue 2007 Toyota Avalon, registered to BROWN.

other individuals who had similar physical features to BROWN. The photo of BROWN was labeled with the number 1. CUNNINGHAM identified the photo of BROWN as the person with whom she met on June 6, 2025, and from whom she received the $125,900 in cash at the Giant grocery store parking lot.

21.     In or about July 2025, Special Agent James Shaw with DEA Detroit Field Division executed a federal warrant for the cellular phone of REEVES and provided a copy of the forensic download to Special Agent Rubright. After reviewing the forensic download, investigators identified phone number (434) 825-2094 was in contact with REEVES. Investigators observed that open sources associated the phone number with BROWN. Investigators also observed that BROWN was previously associated with the address 790 Prospect Avenue, Charlottesville, VA 22903.

22.     Investigators observed the subscriber for the phone number was Georgia Fowler, who also had the address 790 Prospect Avenue, Charlottesville, VA 22903. Investigators reviewed a screenshot of a WhatsApp conversation between REEVES and (434)825-2094 taken on or about June 3, 2025 – three days before the controlled delivery. Investigators observed the user of the phone utilizing Black male emoticons to convey emotion in the conversation. Additionally, investigators observed that the user of the phone stated to REEVES, "I'll have that $126K."4 REEVES responds by saying, "You know I gotta have 19.5 for the three." In my training and experience, I believe that "19.5 for the three" is referring to $19,500 for three kilograms of cocaine.

23.     Messages between REEVES and phone number (434) 825-2094 also indicated that the user of (434) 825-2094 was concerned about the $129,500 that was seized as part of this operation, and was attempting to make the money back. In a text message on or about June 10, 2025, the user of (434) 825-2094 tells REEVES, "Cuz whats the move on getting this money back?? I told my man I'm working on getting him his bread bk as well as my own." Based on my training and experience, I believe this message to mean that the user of (434) 825-2094 was asking about the money that was seized in connection with this operation.

24.     On or about July 3, July 7, and July 8, 2025, the SUBJECT VEHICLE was observed parked outside of 1808 Solomon Road, Charlottesville, Virginia, which is based in the Western District of Virginia. Investigators

---

4 The total amount of money delivered to CUNNINGHAM by BROWN on or about June 6, 2025, was $125,900.

observed, through open-source queries, that 1808 Solomon Road, Charlottesville, Virginia, has been associated with BROWN.

25.    I believe that tracking the movement of the SUBJECT VEHICLE will allow investigators to identify potential stash locations, customers, and distributors who are working with BROWN to distribute narcotics. To track the movement of the SUBJECT VEHICLE effectively and to decrease the chance of detection, I seek to place a tracking device in or on the SUBJECT VEHICLE while it is in the Western District of Virginia.

26.    In order to place a tracker on the SUBJECT VEHICLE, I request permission to enter onto private property, including driveways and open vehicle shelters, wherever the SUBJECT VEHICLE is located, in order to complete the installation, repair, replacement, and removal of the tracking device. I am not requesting permission to enter a closed garage or other secure enclosure. I know, based on this investigation to date, and on my training and experience, that groups who are engaged in drug trafficking and conspiracy to commit drug trafficking and other related criminal activity may share and/or move vehicles in order to obscure their location and ownership from law enforcement. To ensure the safety of the executing law enforcement officer(s), and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, repair, replacement and removal of the tracking device during both daytime and nighttime hours.

27.    In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period of 45 days from the date the warrant is issued.  The tracking device may produce signals from inside private garages or other such locations that are not open to the public or for visual surveillance.

28.    In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I request that the warrant delay notification of the execution of the warrant for a period not to exceed 30 days after the end of the authorized period of tracking (including any extensions) because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the ongoing criminal investigation.

**CONCLUSION**

WHEREFORE, your affiant respectfully requests that the Court issue a tracking warrant authorizing members of the DEA, or their authorized representatives, or other law enforcement agents, analysts, and/or

technicians assisting in the above-described investigation:

(a)     to install a tracking device in or on the SUBJECT VEHICLE within the Western District of Virginia within 10 calendar days of the issuance of the requested warrant;

(b)     to maintain, repair, and/or replace the tracking device as necessary;

(c)     to remove the tracking device from the SUBJECT VEHICLE after the use of the tracking device has ended;

(d)     to enter onto private property to affect the installation, maintenance, and removal of the tracking device;

(e)     to move the SUBJECT VEHICLE to affect the installation, maintenance, and removal of the tracking device; and

(f)     to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations that are not open to the public or for visual surveillance, both within and outside the Western District of Virginia.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

s/*Alen Krso*
Alen Krso
Special Agent
Drug Enforcement Administration

Attested to in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on this 7th day of August 2025.

_____
JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE